E-FILED
Wednesday, 20 August, 2008  02:34:44 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES  DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

| | | |
|---|---|---|
| **RONALD PARK,** | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Case No. 07-2227** |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| **Defendant.** | ) | |

# REPORT AND RECOMMENDATION

In May 2007, Administrative Law Judge (hereinafter "ALJ") James Gildea denied Plaintiff Ronald Park's application for disability insurance benefits (hereinafter "DIB") and supplemental security income (hereinafter "SSI"). The ALJ based his decision on findings that despite Plaintiff's limitations, Plaintiff can perform his past work, and, alternatively, Plaintiff could perform other jobs that exist in the economy.

In December 2007, Plaintiff filed a Complaint for Judicial Review (#3) against Defendant Michael J. Astrue, Commissioner of Social Security (hereinafter "Commissioner"), seeking judicial review of the ALJ's decision to deny social security benefits. In March 2008, Plaintiff filed a Motion for Summary Judgment or Remand (#9). In June 2008, Defendant filed a Motion for an Order Which Affirms the Commissioner's Decision (#13). In July 2008, Plaintiff filed a Reply in Support of His Motion for Summary Judgment or Remand (#16). After reviewing the administrative record and the parties' memoranda, this Court recommends, pursuant to its authority under 28 U.S.C. § 636(b)(1)(B), that Plaintiff's Motion for Summary Judgment or Remand (**#9**) be **GRANTED.**

## I.  Background

### A.  Procedural Background

Plaintiff filed an application for DIB and SSI in April 2004, alleging disability beginning January 19, 2004. The claims were denied initially in June 2004 and twice upon reconsideration.

Plaintiff filed a written request for a hearing, and ALJ Gildea held a hearing in April 2007.  In May 2007, the ALJ issued a decision finding that Plaintiff was not entitled to benefits.  In October 2007, the Appeals Council denied Plaintiff's request for review.  Pursuant to 42 U.S.C. § 405(g), Plaintiff timely sought judicial review of the final administrative decision of the Commissioner of Social Security denying his claims for benefits.

## B.  Plaintiff's Background

Plaintiff was forty-eight years old on his alleged onset date and fifty-two at the time of the ALJ's decision.  (R. 114.)  Plaintiff stands five feet nine inches and weighs 195 pounds. (R. 509, 552.)  Plaintiff has a high school education and has completed three years of college. (R. 162.)  Plaintiff's past work includes work as a maintenance supervisor and travel counselor. (R. 209.)  In his report to the agency, Plaintiff indicated that the maintenance supervisor job required walking for one hour, standing for one hour, sitting for one half hour, and lifting up to twenty pounds.  (R. 210.)  His work as a travel counselor required him to walk, stand, and sit for two hours each, and lift up to fifty pounds.  (R. 211.)

## C.  Plaintiff's Condition

Plaintiff filed for disability alleging that he was disabled based on hypertension, joint pain, and depression.  He has also been diagnosed with chronic obstructive pulmonary disease (hereinafter "COPD") and experiences chest pain.

### 1.  Medical Records

Prior to his alleged onset date, Plaintiff had surgery on his right shoulder in 1985 (R. 265), and surgery on his right ankle in 1986 (R. 257).  In February 2004, Plaintiff went to the emergency room at Provena United Samaritans Medical Center with acute gastroenteritis. (R. 359-61.)  Dr. Suhail Alnaqib treated Plaintiff with IV fluids and morphine injections as needed.  (R. 361.)  Dr. Alnaqib noted that Plaintiff had a history of GERD and a history of chest pain considered noncardiac in origin.  (R. 361.)  Dr. Alnaqib treated Plaintiff with Vicodin for chest pain.  (R. 361.)

After his alleged onset date, Plaintiff underwent an echocardiogram, a stress test, and a CT scan on his abdomen.  (R. 367, 368, 369.)  The echocardiogram showed that the left ventricle size and systolic contraction of all the segments was normal; however, the "left ventricle reveals mild diastolic dysfunction."  (R. 367.)  Plaintiff's hemoglobin levels suggested mild pulmonary hypertension.  (R. 367.)  The tests further showed that both atrial dimensions were normal. (R. 367.)  Plaintiff's stress test showed no evidence of any reversible or fixed defect in the left ventricular wall and the ventricular wall motion appeared unremarkable.  (R. 368, 371.)  There had been no new findings or significant change since October 25, 1999.  (R. 368, 371.) Plaintiff's CT scan showed very minimal prominence of the head and uncinate process, and no new findings since January 27, 1997.  (R. 369.)

In May 2004, Dr. Alnaqib filled out a Cardiac Report form from the Bureau of Disability Determination Services.  (R. 381.)  Dr. Alnaqib's diagnosis was chest pain, dyspnea (difficulty breathing), elevated lipids, and depression.  (R. 381.)  Dr. Alnaqib diagnosed Plaintiff with pulmonary hypertension with no evidence of neurological complications.  (R. 381.)  At rest, Plaintiff experienced chest discomfort with aching and soreness in his left chest lasting more than an hour.  (R. 383.)  Plaintiff had recurrent or persistent fatigue, dyspnea, and orthopnea (dyspnea while lying down).  (R. 384.)  During ordinary physical activity, Plaintiff experienced dyspnea.  Dr. Alnaqib instructed Plaintiff to avoid activity that causes symptoms.  (R. 384.)  He also found that Plaintiff was able to perform activities of daily living such as performing household duties, grocery shopping, taking out the garbage, walking one or two blocks, and climbing one flight of stairs at his own pace.  Echocardiography showed diastolic dysfunction, but there was no wall motion abnormality or audible third heart sound.  (R. 384.)  Plaintiff was prescribed Verapamil, Prilosec, Hydrocodone, Lonox, Liptior, Combivent, and Zoloft.  (R. 385.)

In May 2004, Plaintiff went to the Provena United Samaritans Medical Center emergency room with a sprained left ankle.  (R. 354.)  Dr. Alnaqib treated Plaintiff with ice and a splint. (R. 354, 356.)  Throughout 2004, Dr. Alnaqib treated Plaintiff for various ailments.  (R. 373-76.)

3

Dr. Alnaqib noted that Plaintiff was forgetful, disoriented, edgy, and slept a lot.  (R. 373.) Plaintiff had shortness of breath with clear lungs.  (R. 373.)

In May 2005, Dr. Vittal Chapa, an internal medicine specialist, examined Plaintiff. Plaintiff provided medical history, and Dr. Chapa found him reliable and cooperative. (R. 387, 390.)  Plaintiff told Dr. Chapa that he had joint pains in the ankles, elbows, shoulders, and hips.  (R. 387.)  Plaintiff also complained of chest pains that could last up to one hour and that sometimes had lasted up to three hours.  (R. 387.)  Dr. Chapa noted that Plaintiff had been told that he has pulmonary hypertension and that his shortness of breath was due to pulmonary hypertension.  (R. 387.)  Plaintiff had a pressure sensation in the back of the head, which could occur three to four times a week and lasted all day at times.  (R. 387.)  Plaintiff reported that he smoked one pack of cigarettes per day for the last twenty years.  (R. 387.)

During his May 2005 examination, Dr. Chapa found Plaintiff was able to bear weight and to ambulate without assistance.  (R. 388.)  Dr. Chapa observed that Plaintiff was alert and oriented, did not seem to have any delusions or hallucinations, could answer questions appropriately, and was in good contact with reality.  (R. 388.)  Dr. Chapa's motor examination revealed no specific motor weakness or atrophy.  (R. 389.)  Plaintiff's knee, ankle, triceps, and biceps reflexes were symmetric.  (R. 389.)  During his examination of the musculoskeletal system, Dr. Chapa found that Plaintiff had a full range of motion in both ankles and both elbows with a slightly decreased range of motion of the right shoulder.  (R. 389.)  He exhibited a full range of motion of the left shoulder and there was no evidence of joint redness or heat and no evidence of paravertabral muscle spasm.  (R. 389.)  Plaintiff had good hand grip bilaterally and could perform both fine and gross manipulations with both hands.  (R. 389.)  Plaintiff's lumbosacral spine flexion was normal.  (R. 389.)  Straight leg raising test was negative bilaterally and he exhibited no major restriction of range of motion in his hip or knee joints. (R. 389.)

4

In May 2005, Dr. Stephen Vincent, a psychologist, performed a psychological evaluation. Prior to the exam, Dr. Vincent reviewed progress note summaries that indicated a history of chest pain, dyspnea, and elevated lipids, as well as a history of depression. (R. 393.) Dr. Vincent noted that Plaintiff's personal hygiene and grooming were intact and he had no evident posture or gait disturbances. (R. 393.) Plaintiff reported a history of depression that had increased due to physical problems and chronic pain. He stated that he was sad much of the time, felt discouraged about his future, and felt as though he was a complete failure as a person. (R. 393-94.) He had thoughts of suicide in the past but denied any present intention or plan to harm himself. (R. 394.) Plaintiff reported difficulties with irritability and agitation, stating, "I just can't get along with people." (R. 394-95.) His energy level was low and he was quite withdrawn and isolated. (R. 394.) He reported his memory was poor and he was quite forgetful and had difficulties concentrating for very long periods due to his depression and pain. (R. 394.) Dr. Vincent observed that his thought processes were logical, coherent, and relevant and that Plaintiff had no difficulty relating to the examiner. (R. 394.) At the time of the exam, Dr. Vincent opined that Plaintiff had the cognitive capacity to effectively manage his own funds and he was not suicidal or psychotic. (R. 395.) While Dr. Vincent found that Plaintiff was cognitively intact, he also found that Plaintiff had difficulties fully utilizing his intellectual resources due to low tolerance for stress and frustration. (R. 395.) Dr. Vincent diagnosed Plaintiff with mood disorder, secondary to general medical conditions, with major depressive-like features. (R. 395.)

Starting in August 2005, Plaintiff sought treatment at Aunt Martha's Youth Service Center. (R. 396-416.) Plaintiff's permanent problems included hypertension, hyperlipids, COPD aggravated by smoking, GERD, depression and anxiety, insomnia and fatigue, increased blood pressure, atypical chest pains, and bronchitis. (R. 396, 461.) His medications included Zoloft, Klonopin, Naprozym, Verelan, Combivent, Lipitor, Seroquel, Prevacid, Levaguin, and Prednisone. (R. 461.) Plaintiff sought treatment at Aunt Martha's Health Center on September 6, 2005 (R. 503, complaints of bilateral arm numbness); October 1, 2005 (R. 500, given medication samples); November 22, 2005 (R. 500, complaints of arm pain and numbness); January 25, 2006 (R. 497, complaints of chest pain, numbness in both hands, and lungs

"whistling" in his sleep); March 15, 2005 (R. 496, shortness of breath when out of Verelan); April 6, 2006 (R. 465, hypertension uncontrolled); June 7, 2006 (R. 464, 491, bronchitis and COPD); July 18, 2006 (R. 462, 488, COPD stable with Advair and Combivent and depression stable); October 26, 2006 (R. 486, COPD and joint pain); January 18, 2007 (R. 485, abdomen abnormal); March 16, 2007 (R. 552, Plaintiff prescribed oxygen at home for night use); and April 16, 2007 (R. 553-54, MRI of lumbar spine showed mild bulging).

In August 2005, Plaintiff sought treatment at Provena United Samaritans Medical Center. During testing, Plaintiff had mild cardiomegaly, but there were no new findings since January 2003. (R. 411, 507.) During a stress echo cardiogram in October 2005, Dr. Bhaskar Patel found negative stress echocardiography at the tested level of exercise and heart rate. (R. 456, 501.) In January 2007, Plaintiff went to Provena's emergency room complaining of left side abdominal pain. (R. 535.) In February 2007, Plaintiff went to Provena's emergency room with an injury to his right ankle. (R. 481, 532.) He had no acute fracture or dislocation, but clinic notes indicated soft tissue swelling adjacent to the lateral malleolus and several white patches on the skin. (R. 481, 526, 531-32.) In March 2007, Plaintiff went to the Provena emergency room complaining of difficulty breathing, cough, and fever. (R. 516.) Chest test results were compared to August 2005 test results and clinic notes indicated "borderline cardiac size." (R. 523, 555.) The lungs were clear and there was no acute cardiopulmonary process. (R. 523, 555.) Clinic notes mention evidence of previous right shoulder surgery with a metallic screw showing in the radiograph. (R. 523, 555.) The conclusion was that Plaintiff exhibited no acute cardiopulmonary process. (R. 523, 555.)

In August 2005, Dr. Lee evaluated Plaintiff and noted that Plaintiff stated that he was angry and that people were "against him." (R. 417.) Dr. Lee noted that Plaintiff had attempted suicide before, but that he had no active suicidal ideas and no cognitive deficit. (R. 417.) Dr. Lee diagnosed Plaintiff with recurrent major depressive disorder and noted a GAF of 65. (R. 417.) In August 2006, Dr. Lee performed a biophysical update and recommended continued individual therapy. (R. 477.) In January 2007, Dr. Lee prescribed Zoloft and Seroquel. (R. 476.)

6

## 2.  Physical Residual Functional Capacity Evaluations

Two agency doctors reviewed Plaintiff's medical record and provided separate physical Residual Functional Capacity (hereinafter "RFC") evaluations.

In May 2004, Dr. Stanley Burris evaluated Plaintiff's physical RFC.  (R. 448.)  Dr. Burris found that Plaintiff could occasionally lift or carry up to twenty pounds and frequently lift or carry up to ten pounds.  (R. 449.)  Plaintiff could stand or walk for about six hours and sit for about six hours in eight-hour workday.  (R. 449.)  Plaintiff had an unlimited ability to push or pull.  (R. 449.)  Dr. Burns stated that Plaintiff had been diagnosed with pulmonary hypertension and his lab work was normal.  (R. 449.)  Plaintiff had experienced fatigue, chest pain, and dyspnea; however, he had not experienced significant complications or abnormalities.  (R. 449.)  Dr. Burris stated that Plaintiff's condition was basically controlled with medications.  (R. 449)

Dr. Burris opined that due to his fatigue and dyspnea, Plaintiff could only occasionally climb, balance, stoop, kneel, crouch, and crawl and he should not perform frequent postural exertions.  (R. 450.)  He stated that Plaintiff had no manipulative, visual, or communicative limitations (R. 451-52), but he should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, fumes, odors, gases, and hazards (R. 452).  The doctor noted no restrictions regarding exposure to noise or vibration.  (R. 452.)  Based on Plaintiff's fatigue and dyspnea, Dr. Burris opined that Plaintiff should avoid frequent environmental exposure. (R. 452.)  The doctor also noted that he had reviewed a treating source statement and it was not significantly different than his RFC.  (R. 454.)

In June 2005, Victoria Dow also evaluated Plaintiff's physical RFC.  (R. 440.)  She found that Plaintiff could occasionally lift or carry a maximum of fifty pounds and frequently lift a maximum of twenty-five pounds.  Plaintiff could stand or walk for about six hours out of an eight-hour workday and sit with normal breaks for six hours out of an eight-hour workday. (R. 441.)  Ms. Dow found that Plaintiff's ability to push or pull was unlimited.  (R. 441.)  He had no visual, communicative, or environmental limitations.  (R. 443-44.)  In contrast to Dr. Burris,

7

Ms. Dow found that Plaintiff had no postural limitations.  (R. 442.)  Ms. Dow opined that Plaintiff was limited in his ability to reach in all directions (including overhead), but unlimited as to gross and fine manipulation and feeling.  (R. 442.)

### 3.  Mental RFC Evaluations

In June 2005, Dr. Ronald Havens evaluated Plaintiff's mental RFC.  (R. 422.)  Dr.Havens found that Plaintiff was not significantly limited in any line item except for his ability to carry out detailed instructions, which was moderately limited.  (R. 422-23.)  He opined that Plaintiff retained the mental capacity to understand and remember simple one and two step instructions at a minimum, to persist in simple tasks, to get along with others, and to adjust to changes in the work setting.  (R. 424.)

### D.  The Hearing Before the ALJ

The ALJ held a hearing in April 2007, during which Plaintiff, Plaintiff's friend Larry Nicholson, and Dr. Bob Hammond, a vocational expert (hereinafter "VE"), testified.

Plaintiff testified that he graduated from high school and had three years of college education during which he received his associate's degree in science.  (R. 580.)  He was last employed in January 2004 at a nursing home as a maintenance worker.  (R. 581.)  He worked at the nursing home for eight months until he had trouble breathing.  (R. 581.)  Plaintiff testified he also left because he "couldn't put up with the people and all the dying and everything else just made me sick."  (R. 581.)  Since leaving that job, he has not looked for employment elsewhere.  (R. 581.)  Plaintiff testified that he had worked in maintenance for a hotel in the past, but was fired due to problems with his boss and pain in his neck and shoulder.  (R. 581.)  Plaintiff has worked at different hotels doing maintenance work, and he supervised other employees while working at Ramada Inn.  (R. 382.)  He was fired from most of these jobs due to altercations at work mostly involving his bosses.  (R. 583, 600.)  He had also worked as a travel counselor.  (R. 584.)

Plaintiff testified that he lives with his girlfriend in a trailer owned by Larry Nicholson. (R. 579.)  He occasionally drives up to five miles.  Mr. Nicholson drove him to the hearing. (R. 602, 580.)  Plaintiff testified that his medication causes him to hallucinate, which makes him uncomfortable with driving.  (R. 603.)  Plaintiff also testified that the pain in his neck and back from sitting in the car make driving unbearable.  (R. 603.)  Plaintiff testified that he mostly sits around the house or sits on his porch with his feet propped up during the day.  (R. 590.)  He does not do any physical activity at all and listens to the radio for entertainment.  (R. 590.)  Plaintiff testified that he sees his friend Larry once or twice a week.  (R. 610.)  Plaintiff has no hobbies and does not read.  (R. 604.)  He testified that he does not go for walks or anything like that. (R. 591.)  His girlfriend cooks their meals, cleans, and does laundry.  (R. 590, 597.)  Plaintiff testified that he bathes and dresses himself but his girlfriend sometimes helps him.  (R. 605.)

Plaintiff testified at the hearing that he had been on oxygen for about a month and that he uses it at night and when it is hot and humid outside.  (R. 585.)  He spends three to four hours on oxygen during a twenty-four-hour period.  (R. 585.)  Plaintiff testified that he uses an inhaler and that exertion, heat, humidity, and extreme cold cause problems with his breathing.  (R. 592.)  He takes over-the-counter Tylenol for pain.  (R. 585-86.)  He used to take hydrocodone but stopped due to its addictive nature and the fact that it failed to relieve his pain.  (R. 596.)  Plaintiff sleeps for three to four hours in five- to fifteen-minute segments during a twenty-four-hour period, and this has been the case for two to three years.  (R. 586, 600.)  He has a prescription for Klonopin to help him sleep.  (R. 593.)  Plaintiff testified that he smokes about one cigarette a day. (R. 586-87, 591.)  He had not lost or gained weight recently and eats about one meal a day. (R. 591.)

Plaintiff goes to a doctor regularly once or twice a month.  (R. 587.)  Plaintiff testifies that he sees doctors at Crosspoint about twice a month for his mental problems.  (R. 587.)  His doctors at Crosspoint have prescribed Zoloft and Seroquel.  (R. 588.)  Plaintiff testified that his principal health problems are trouble breathing and pain in his neck and back.  Plaintiff stated that his "joints are coming apart" and that he has had multiple surgeries in the past but none in the last four years.  (R. 589.)  Plaintiff also testified that he has pain in both his legs and that both

his arms go numb. (R. 589.)  He was diagnosed with carpal tunnel in both arms and that is why he was wearing splints at the hearing.  (R. 589-90.)

Plaintiff testified that he has had trouble with his memory during the last five years, and this has been getting worse.  (R. 594.)  His right leg moves constantly and he cannot stop it. (R. 595.)  He must change positions often because of the pain in his back and neck.  (R. 595.) Plaintiff testified that he does not like people in general and only likes his one friend, Larry Nicholson.  (R. 596.)  He keeps the curtains in his trailer closed and does not answer the phone or door because he does not want to "deal with" people.  (R. 598.)  Plaintiff testified that people call him a "hermit" and that he has always found it difficult to get along with people at work.  (R. 598.)  Plaintiff testified that when he wakes up from his periodic naps, he feels pain, hurt, depressed, scared, and nervous.  (R. 601.)  He testified that he often feels confused and "just kind of lost."  (R. 601-02.)

Plaintiff testified that he could not do a simple repetitive job where he would have to follow directions from a supervisor.  (R. 605.)  He could not do so because "people are idiots and I don't take orders from idiots."  (R. 605.)  For the same reason, Plaintiff testified that he could not cooperate with his fellow employees if he had a job.  (R. 605.)  Plaintiff also testified that he could sit upright to do a job for only ten to fifteen minutes and could stand for only five to ten minutes.  (R. 605-06.)  He testified that he could do those two things for an hour total.  (R. 606.) Plaintiff testified that he has trouble handling small objects with his hands and fingers and is constantly dropping things.  (R. 606.)  His right side is worse than his left.  (R. 606.)  Plaintiff's counsel asked him if he had a job handed to him on a silver platter and could sit, stand, or rest as he wished, could he show up for work everyday.  (R. 607.)  Plaintiff responded that he could not because of the pain in his back and his legs, his breathing problems, and because if he went to work, "somebody would be getting slapped."  (R. 607.)  He also testified that he would miss twelve days out of twenty-two workdays.  (R. 607.)

10

The ALJ asked Plaintiff if his skin coloring was his natural skin color and Plaintiff testified that it was not a suntan.  (R. 608.)  In response to the ALJ's question about where Plaintiff got his hair cut, Plaintiff stated that his girlfriend cuts his hair.  (R. 608.)  The ALJ commented that the haircut looked professional and asked whether Plaintiff's girlfriend was a professional.  (R. 609.)  Plaintiff answered that she was not.  (R. 609.)

Next, Plaintiff's friend Larry Nicholson testified that he had known Plaintiff for over forty years and sees him two or three times a week.  (R. 612.)  Mr. Nicholson testified that when Plaintiff was younger he was friendly, had a good sense of humor, and was athletic, but that had changed during the last three or four years.  (R. 612-13.)  Mr. Nicholson testified that Plaintiff forgets things, drops things, becomes irritable a lot, and moves very slowly.  (R. 613, 616, 619.)  He also testified that Plaintiff likes to avoid or shun people.  (R. 615.)  Mr. Nicholson lets Plaintiff stay in his trailer, and Plaintiff's girlfriend pays the utilities.  (R. 615, 626.)  Plaintiff used to help Mr. Nicholson with his home remodeling but has not done so recently.  (R. 615-16.)  Mr. Nicholson also testified that he was never in business with Plaintiff because he could not work with him.  (R. 627.)  Mr. Nicholson testified that Plaintiff is out of breath "all the time" and is "always looking for a place to sit down."  (R. 617.)  Mr. Nicholson testified that Plaintiff's skin coloring was not from being outside because he does not go outside very much.  (R. 617.)  Mr. Nicholson testified that he has not seen Plaintiff walk any distance, stoop, bend, twist, crawl, climb, or handle heights.  (R. 619.)  He testified that Plaintiff cannot sit for very long.  (R. 619.)  Mr. Nicholson testified that Plaintiff "favors his left [leg] more."  (R. 628.)

The VE testified that Plaintiff's past work as a maintenance worker was classified medium exertional skilled work as Plaintiff performed his job.  (R. 633.)  The travel counselor job is a skilled position classified as sedentary.  (R. 633.)  The VE testified that these jobs provided several transferable skills including ordering, mechanical, and repair skills.  (R. 633.)  In his first hypothetical question, the ALJ asked the VE to consider an individual who was approaching advanced age, had more than a high school education and the same past relevant work as the claimant, and has the RFC to perform at the medium exertional level with the additional limitation that the individual cannot reach overhead more than occasionally with the

11

right dominant upper extremity.  (R. 634.)  The VE testified that such a person could not perform the maintenance position, but could perform the travel counselor position.  (R. 634.)  When asked whether an additional limitation of the job not requiring the individual to understand, recall, or carry out detailed instructions would affect the individual's ability to perform the travel counselor job, the VE testified that such a limitation would eliminate the travel counselor job, but that the individual could do other medium level jobs available in the economy.  (R. 634.)  If the exertional level was restricted to light work, the individual could still perform a number of jobs available in the economy.  (R. 634-35.)  In his third hypothetical question, the ALJ added an additional limitation of no climbing ladders, ropes or scaffolds, no more than occasional climbing of ramps and stairs, and no more than occasional balancing, stooping, kneeling, crouching, or crawling.  (R. 635.)  The VE testified that the individual could perform a number of jobs available in the economy.  (R. 635.)

### E.  The ALJ's Decision

The SSA defines "disabled" as the inability "to engage in any substantial gainful activity by reason of any medically-determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  To determine whether a claimant is disabled within the meaning of the Social Security Act, the ALJ must proceed through a five-step analysis.  20 C.F.R. § 416.920(a-f).  At each step, if the ALJ affirmatively finds the claimant disabled or not disabled, the inquiry ends, but if no determination can be made, the Commissioner proceeds to the next step.  20 C.F.R. § 416.920(a)(4).  If the claimant is currently employed or was previously employed during the relevant period, he is not disabled.  20 C.F.R. § 416.920(a)(4)(i).  The second question is whether the claimant has a severe medical impairment that will last at least twelve months.  20 C.F.R. § 416.920(a)(4)(ii).  If the claimant does not have a severe impairment, the inquiry ends.  *Id*.  However, if the claimant has a severe impairment, the third step is to ask whether the severe impairment meets or equals one listed in Appendix 1 to subpart P of part 404 of Chapter 20.  20 C.F.R. § 416.920(a)(4)(iii).  If it does, the claimant is disabled.  *Id*.  If it does not, the fourth question is whether the claimant is able to perform his past relevant work with his current impairment.  20 C.F.R. § 416.920(a)(4)(iv).  If he

can, then he is not disabled.  *Id.*  If he is not able to perform his past work, the fifth and final question is whether, with his current limitations, he can perform other work which exists in significant numbers in the national economy.  20 C.F.R. § 416.920(c)(1).

Here, the ALJ found that Plaintiff had not engaged in substantial gainful activity since the alleged onset date.  (R. 36.)  The medical evidence established that Plaintiff has severe pulmonary hypertension, mild osteoarthritis of the cervical spine, and a mood disorder.  (R. 36.)  Nevertheless, the ALJ found that Plaintiff does not have an impairment or combination of impairments listed in or medically equal to the Listing.  (R. 36.)  The ALJ found that Plaintiff's alleged limitations were not fully credible because they were not completely supported by the medical evidence or relevant credibility factors.  (R. 36.)  The ALJ found that Plaintiff has the RFC to perform the physical exertional and nonexertional requirements of medium work, with no more than occasional overhead reaching with his right upper extremity.  (R. 36.)  As a result, Plaintiff is unable to perform his past relevant work as a maintenance supervisor, but he can return to past work as a travel counselor.  (R. 36.)  Plaintiff's RFC for the full range of medium work is reduced by nonexertional limitations.  (R. 36.)  Based on an exertional capacity for medium work and Plaintiff's age, education, and work experience, the ALJ found that Plaintiff was not disabled.  (R. 37.)  Although Plaintiff's additional nonexertional limitations do not allow him to perform the full range of medium work, there are a significant number of jobs in the national economy that he could perform.  (R. 37.)

### F.  Appeals Council Consideration

In July 2007, Plaintiff asked the Appeals Council to review the ALJ's decision, including consideration of additional evidence that was not available to the ALJ at the time of the hearing. The additional evidence included a report of a CT scan dated April 24, 2007, and psychiatric records from Dr. Kahlon dated June 13, 2007.  In October 2007, the Appeals Council denied Plaintiff's request for review.

13

## II.  Standard of Review

The ALJ's decision is subject to review pursuant to 42 U.S.C. § 405(g), which provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The United States Supreme Court has defined substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consol. Edison Co. v. New York*, 305 U.S. 197 (1938)).  Where conflicting evidence may allow reasonable minds to differ as to whether a claimant is disabled, the responsibility for making that determination rests with the ALJ.  *Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996); *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987).  Therefore, the question for review is not whether the claimant is disabled, but whether substantial evidence in the record supports the ALJ's finding of no disability.  *Id.*  The Court defers to the ALJ's credibility determinations, "so long as they find some support in the record."  *Edwards v. Sullivan*, 985 F.2d 334, 388 (7th Cir. 1993).

## III.  Discussion

Plaintiff argues that the Court should reverse and remand this case because the ALJ's decision is not based upon substantial evidence.  Specifically, Plaintiff contends that (1) the Appeals Council erred by failing to consider new and material evidence; (2) the ALJ made an erroneous credibility determination; (3) the ALJ failed to properly weigh the evidence, resulting in a faulty RFC, incomplete hypotheticals, and improper findings at Step Four and Five; (4) the ALJ erred when he found Plaintiff could perform his past relevant work; and (5) the ALJ failed to meet his burden at step five.

Before discussing these substantive issues, the Court will address the ALJ's conduct during the hearing as indicated in the transcript.  The ALJ repeatedly interrupted Plaintiff and his witness, Larry Nicholson, while they were answering his questions.  Moreover, at times, the ALJ acted in an adversarial and confrontational manner with Plaintiff's attorney during the hearing, as illustrated by the following excerpt from the hearing transcript:

14

> ATTY (questioning Mr. Nicholson):  I just want to follow up a little bit, Judge. The, the indication we had at one point in your conversation with the Judge was that you let him [Plaintiff] live in the trailer because he was helping you do things.  Now did I, did we get that wrong or is that, did I hear it wrong.
> ALJ:  That's what he testified, he testified to that, Mr. Doyle, that's what my notes say and that's what he testified.  I think the record will show that.
> ATTY:  Well, I, I don't think, it wasn't quite that clear.  I mean at what point in time was he helping you out, if he was?
> WITNESS (Nicholson):  Before he moved into my trailer.
> ATTY:  Before, okay.
> WITNESS:  Yeah.
> ATTY:  So if you were –
> ALJ:  Mr. Doyle, let's not read, redirect – I asked him why he was living there and he said he was helping him out.
> ATTY:  No, Your Honor, I don't think he did, Judge.
> ALJ:  We can argue this point but the record will speak for its self.  But I mean let's not try to reconstruct the facts, I mean his testimony is what it is.
> ATTY:  I don't care if you want to call it redirect or re-cross or whatever you want to call it, Judge, but I think I have a right to clarify –
> ALJ:  Well, don't lead, don't lead and don't put words in his mouth.
> ATTY:  I asked – that wasn't a leading question that we started this discussion with.
> ALJ:  Well, you told him what he said, you told him now was that before, you're giving him all the clues and it gets very obvious that you're leading him.
> ATTY:  He also testified that he stopped helping out two years ago, so I don't think it's leading.  He testified under your correct, under your, under your direct examination.

(R. 629-30.)  The Court has reviewed Mr. Nicholson's testimony and agrees with Plaintiff's attorney that Mr. Nicholson's testimony was, in fact, not as the ALJ described it.  The ALJ's mischaracterization of Mr. Nicholson's statement indicates to the Court that the ALJ may have had a preconceived notion of the result and tried to shape the testimony to that effect.  This raises a preliminary concern that Plaintiff did not get a fair hearing.  *See Schweiker v. McClure*, 456 U.S. 188, 195 (1982).  Plaintiff deserves more than a mere procedural exercise in which the result is predetermined.  *See Marshall v. Jericho*, 446 U.S. 238, 242 (1980).  The ALJ's role is to "make an impartial decision as an adjudicator, not [act] as an advocate or adversary." *Stackhouse v. Chater*, No. 3:95-cv-934RP, 1996 WL 697936, at *11 (N.D. Ind. Nov. 1, 1996) (unreported).  Here, although the ALJ's conduct may not have been so egregious as to warrant

reversal solely on that basis, it contributes to the Court's recommendation to remand.  *See, e.g.,*
*Sarchet v. Chater*, 78 F.3d 305, 309 (7th Cir. 1996).

### A.  Appeals Council's Treatment of New Evidence

Plaintiff first argues that the Appeals Council erred when it did not remand the case to the
ALJ for reconsideration in light of Dr. Kahlon's notes regarding Plaintiff's June 13, 2007,
appointment.  (R. 25-27.)  Plaintiff contends that because the Appeals Council stated it
considered the reasons Plaintiff disagreed with the ALJ's decision, it had to review all the
evidence submitted.  Plaintiff asks this Court to reverse the Appeals Council's decision because
it rests on a mistake of law.  In support of this premise, Plaintiff relies on *Eads v. Secretary of*
*the Department of Health and Human Services*, 983 F.2d 815, 817 (7th Cir. 1993).  Plaintiff
contends that the new evidence regarding Plaintiff's mental health is material because it would
change the ALJ's decision.  Alternatively, Plaintiff argues that he had good cause for failing to
submit the evidence during the prior proceeding.  Plaintiff contends that his good cause for
failing to submit the evidence prior to the ALJ's decision is that he obtained it a month after the
ALJ's decision.

Because the Appeals Council denied review of Plaintiff's case, the Court treats the ALJ's
decision as the final decision of the SSA.  *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir.
2006).  The Court agrees with the Commissioner that the Appeals Council's denial of review is
not subject to judicial review.  *See Perkins v. Chater*, 107 F.3d 1290, 1294 (7th Cir. 1997)
(finding that the Appeals Council's decision whether to review a claimant's case is discretionary
and unreviewable).  As a result, the Court cannot consider whether the Appeals Council erred by
denying review of Plaintiff's appeal because of the new evidence.

However, the Court may remand a case to the Commissioner pursuant to sentence six of
42 U.S.C. § 405(g) to consider additional evidence if the evidence is new, material, and there is
good cause for not introducing it during the administrative proceedings.  42 U.S.C. § 405(g)
("The court . . . may . . . order [the Commissioner to consider] additional evidence . . ., but only
upon a showing that there is new evidence which is material and that there is good cause for the

16

failure to incorporate such evidence into the record in a prior proceeding"). Evidence is considered "new" for purposes of a sentence six remand if it was "not in existence or available to the plaintiff at the time of the administrative proceeding." *Schmidt v. Barnhart,* 395 F.3d 737, 741-42 (7th Cir. 2005). New evidence is considered "material" if there is a "reasonable probability that the ALJ would have reached a different conclusion had the evidence been considered." *Id.* at 742. Nevertheless, the evidence must relate to the claimant's condition "during the relevant time period encompassed by the disability application under review." *Id.*

The Commissioner contends that the additional evidence at issue is not material because it pertains to Plaintiff's condition after the ALJ's decision and therefore, it is not relevant to the time period reviewed by the ALJ. The Court agrees. Here, Plaintiff's additional evidence consists of Dr. Kahlon's clinic notes dated June 13, 2007. This evidence was not available to Plaintiff before the ALJ's decision because it contained clinic notes for an appointment that occurred almost a month after the ALJ rendered his decision. The Seventh Circuit court has held that medical records that postdate the hearing  and that "speak only to [the applicant's] current condition, not to his condition at the time his application was under consideration by the Social Security Administration" are not considered "material" evidence. *Id.* (quoting *Kapusta v. Sullivan*, 900 F.2d 94, 97 (7th Cir. 1990); *Murphy v. Barnhart,* 417 F. Supp. 2d 965, 973 (N.D. Ill. 2006)). Moreover, Plaintiff has failed to demonstrate a "reasonable probability" that the ALJ would have reached a different conclusion had he considered this evidence or that he had good cause for failing to procure the evidence prior to the ALJ's decision. As a result, the Court recommends denying the motion for remand pursuant to sentence six of 42 U.S.C. § 405(g).

### B. The ALJ's Credibility Determinations

Next, Plaintiff argues that the ALJ made an improper credibility determination with regard to Mr. Nicholson's and Plaintiff's testimony. In a recent decision, the Seventh Circuit stated that, in reviewing a credibility determination, a court "merely examine[s] whether the ALJ's determination was reasoned and supported." *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008) (citing *Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2001)). "[O]nly when the ALJ's

17

determination lacks any explanation or support . . . [will we] declare it to be patently wrong."  *Id.*
at 413-14 (citing *Jens*, 347 F.3d at 213).

### 1.  Mr. Nicholson's Credibility

Plaintiff argues that the ALJ erred by finding Mr. Nicholson's testimony to be not
credible.  Plaintiff contends that the ALJ misinterpreted Mr. Nicholson's testimony regarding
whether he allowed Plaintiff to stay in the trailer in exchange for Plaintiff's help.  Most
importantly, Plaintiff contends that Mr. Nicholson never said that Plaintiff worked for him in
exchange for a place to live, even though the ALJ "insist[ed] that his misunderstanding was
correct."  (#11, p. 23.)

The ALJ stated that he did not find Mr. Nicholson's testimony credible.  (R. 34.)  The
ALJ expressly stated that Mr. Nicholson testified that Plaintiff provided labor services in
exchange for living in the trailer rent-free.  The ALJ further stated that "[t]he claimant's attorney
led Mr. Nicholson into changing that testimony later, but the undersigned finds that the witness'
altered testimony was untruthful at that point."  (R. 34, referring to testimony on R. 624,
629-31.)

As discussed above, the Court agrees with Plaintiff that the ALJ mischaracterized
Mr. Nicholson's testimony regarding Plaintiff's living arrangement.  The record clearly shows
that Mr. Nicholson did not testify that he let Plaintiff stay in his trailer rent-free in exchange for
Plaintiff working for him.  Moreover, the Commissioner in his brief essentially conceded that the
ALJ's credibility determination of Mr. Nicholson constituted patent error.  The Commissioner
did not address Mr. Nicholson's credibility, simply stating that, even if one did not find
compelling the ALJ's reasoning for discounting Mr. Nicholson's testimony, there are other
reasons to support the ALJ's credibility finding that *Plaintiff* was less than fully credible.
Accordingly, the Court finds that the ALJ's credibility determination of Mr. Nicholson
constituted patent error.

## 2.  Plaintiff's Credibility

Plaintiff next argues that the ALJ erred by finding Plaintiff not credible.  Citing *Carradine v. Barnhart*, Plaintiff states that "once the claimant produces medical evidence of an underlying impairment, the Commissioner may not discredit the claimant's testimony as to subjective symptoms merely because they are unsupported by objective evidence."  *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).  Moreover, Plaintiff contends that the ALJ should have applied the SSR 96-7p factors when assessing Plaintiff's credibility.  In addition, Plaintiff contends that the ALJ failed to note Plaintiff's medications for his mental disorder and his need for oxygen due to COPD.

In response, the Commissioner notes that the ALJ accepted Plaintiff's allegations of pain and other symptoms to the extent they were supported by the record as a whole and he relied on inconsistencies in the record, minimal use of pain medication, normal objective clinical findings, and daily activities in assessing Plaintiff's credibility.  Thus, the Commissioner argues that the ALJ discounted Plaintiff's complaints of disabling symptoms based on a variety of legitimate factors.

In his reply brief, Plaintiff contends that the ALJ's credibility determination of Plaintiff was flawed.  The ALJ noted that Plaintiff does not take strong codeine or morphine-based analgesics usually prescribed for unremitting pain.  Plaintiff's counsel contends that Plaintiff no longer takes hydrocodone because of its addictive nature, and the ALJ failed to consider the other medications in Plaintiff's medical record.  Plaintiff contends that the ALJ's credibility assessment is akin to him creating his own treatment plan for Plaintiff and then finding Plaintiff to be not credible because he did not follow it.  Plaintiff cites *Green v. Apfel* in support of his argument that the ALJ cannot "play doctor."  *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000).

In his decision, the ALJ stated that "although the claimant has an underlying medically determinable impairment that could reasonably cause the symptoms alleged, the medical evidence does not support these symptoms to the degree alleged by the claimant."  (R. 33.)  The ALJ acknowledged SSR 96-7p and stated that "[t]he claimant's statements concerning symptoms

19

will not alone establish disability." (R. 33.) The ALJ found that relevant credibility factors did not support a finding of complete disability.

With regard to Plaintiff's physical impairments, the ALJ enumerated several factors that led to his decision that Plaintiff was not disabled. First, the ALJ noted that Plaintiff does not take strong codeine- or morphine-based analgesics usually prescribed for severe pain. Second, he has not gone to the hospital or emergency room visits for pain since the alleged onset date. Third, other than office visits and prescriptions for pain medication, Plaintiff has not undergone continuing treatment such as physical therapy, attendance at a pain clinic, or the use of a TENS unit. Fourth, Plaintiff does not use a device to ambulate. Fifth, objective signs of severe pain such as abnormal weight loss or muscle atrophy are not present. Sixth, Plaintiff testified that he was reclusive and limited in his daily activities, but the ALJ did not find this credible. Seventh, the ALJ used Mr. Nicholson's testimony regarding his allowing Plaintiff to live in his trailer rent-free as a final factor undermining Plaintiff's credibility. (R. 35.) As stated above, the Court finds that the ALJ's assessment of Mr. Nicholson's credibility constituted patent error and will not consider that factor in reviewing the ALJ's determination of Plaintiff's credibility. However, based on the ALJ's remaining reasons, the Court cannot say that the ALJ's assessment of Plaintiff's credibility regarding his physical limitations constituted patent error.

As to Plaintiff's mental health, the ALJ found that the record did not fully support Plaintiff's allegations for the following reasons: First, Plaintiff has not required a hospital stay or emergency room visit for depression since the alleged onset date. Second, Dr. Lee's progress notes do not support a finding of disability - they showed subjective complaints of Plaintiff, but no psychotic thinking, suicidal or homicidal thoughts, or other signs of severe depression. Third, Dr. Vincent's psychological testing from May 2005 also does not support a finding of disability. Plaintiff said that he was recently switched from Zoloft to Effexor with fair response. Dr. Vincent reported anhedonia, feelings of low self-worth, irritability, difficulty concentrating, and social withdrawal. However, Dr. Vincent opined that Plaintiff's thought processes were logical, coherent, and relevant and Plaintiff had no difficulties relating to Dr. Vincent. (R. 35, 394.) Again, the ALJ adequately explained his reasoning for his credibility determination. As a

result, the Court cannot conclude that the ALJ committed patent error when assessing Plaintiff's claims regarding his mental limitations.

### C. The ALJ's Treatment of the Evidence

Next, Plaintiff argues that the ALJ failed to properly weigh the evidence.  Specifically, the ALJ erred by not properly considering Plaintiff's limitations due to his joint and cervical problems, grip limitations, mental impairments, and COPD.  Alternatively, even if the ALJ found that his impairments are not severe, he failed to include Plaintiff's pain and limitations in his RFC.  Plaintiff also contends that the ALJ should have considered the combined effects of the impairments.  *Sims v. Barnhart*, 309 F.3d 424, 432 (7th Cir. 2002).

First, Plaintiff contends that the ALJ erred when he found that the objective medical evidence did not support Plaintiff's claims of severe pain.  Plaintiff contends that he has consistently reported pain in the joints, chest, knee, back, legs, and neck.  The Court considered the ALJ's credibility assessment above and concluded that the ALJ adequately addressed Plaintiff's alleged pain symptoms.

Second, Plaintiff contends that the ALJ failed to include any grip limitations in the RFC, despite Plaintiff's and Mr. Nicholson's testimony that Plaintiff has trouble handling small objects.  Plaintiff contends that the objective medical record supports the grip limitations.  In his decision, the ALJ referred to Dr. Chapa's May 2005 finding that Plaintiff had "good grip bilaterally" and "can perform both fine and gross manipulations with both hands."  (R. 33, 389.)  The Court finds that the ALJ's treatment of this limitation was not unreasonable or inadequate.

Third, Plaintiff contends that the ALJ failed to adequately consider Plaintiff's mental impairments, and he selectively chose to address only that evidence which supported his decision.  Plaintiff contends that instead of having Dr. Lee or any treating physician complete a mental RFC assessment, the ALJ reached his own conclusion when he found that Plaintiff has only mild limitations.  The ALJ determined that the "mental health records do not fully support the claimant's allegations."  (R. 35.)  Plaintiff's depression was stable (R. 462), and Dr. Vincent

21

observed that Plaintiff's thought processes were logical, coherent, and relevant ( R. 394). The Court addressed the ALJ's assessment of Plaintiff's mental health above when discussing the ALJ's assessment of Plaintiff's credibility with regard to his mental impairments. Furthermore, Plaintiff bases his argument with regard to mental impairment on new evidence that the Court will not consider. In light of the evidence in the record, the ALJ adequately explained his reasoning on this issue.

Finally, Plaintiff contends that the ALJ failed to mention Plaintiff's COPD even though the medical record includes considerable evidence of Plaintiff's breathing problems. The Court finds that this is a correct description of the medical record: Plaintiff received numerous diagnoses of COPD and was prescribed an inhaler and oxygen. (R. 396, 461, 462, 486, 488, 496, 497, 552.) Although the ALJ questioned Plaintiff at the hearing about the fact that Plaintiff was on oxygen, he did not mention Plaintiff's need for oxygen in his decision. (R. 585.)

An ALJ is not required to address every piece of evidence. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). However, meaningful review requires the ALJ to articulate his reasons for accepting or rejecting entire lines of evidence. *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993). Here, the ALJ did not provide any explanation for failing to consider the evidence relating to Plaintiff's COPD and breathing problems. Therefore, the Court recommends remand so that the ALJ may address Plaintiff's breathing problems.

Because the Court finds that the ALJ improperly failed to address an entire line of evidence, the Court cannot determine at this time whether the RFC and the subsequent hypothetical questions presented to the VE were correct. Therefore the Court will not address Plaintiff's arguments regarding steps four and five.

### IV.  Summary

For the reasons set forth above, this Court recommends that Plaintiff's Motion for Summary Judgment or Remand (**#9**) be **GRANTED** and that the case be remanded pursuant to sentence four of 42 U.S.C. § 405(g)[1] for further consideration consistent with this Report and Recommendation.  The parties are advised that any objection to this recommendation must be filed in writing with the clerk within ten (10) working days after being served with a copy of this Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1).  Failure to object will constitute waiver of objection on appeal.  *Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTER this 20th day of August, 2008.

_____
s/ DAVID G. BERNTHAL
U.S. MAGISTRATE JUDGE

---

[1]Under 42 U.S.C. § 405(g), sentence four, "[t]he court shall have the power to enter, upon pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."